# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| Solutran, Inc.<br><br>        Plaintiff,<br><br>v.<br><br>U.S. Bancorp and Elavon, Inc.,<br><br>        Defendants. | Case No. 13-cv-2637 (SRN/BRT) |
| U.S. Bancorp and Elavon, Inc.<br><br>        Counter-claimants,<br><br>v.<br><br>Solutran, Inc.<br><br>        Counter-defendant. | **MEMORANDUM OPINION<br>AND ORDER** |

David J. Wallace-Jackson, Robert J. Gilbertson, and Sybil L. Dunlop, Greene Espel PLLP, 222 South Ninth Street, Suite 2200, Minneapolis, Minnesota, for Plaintiff and Counter-defendant.

Ben D. Kappelman, Kenneth E. Levitt, Peter M. Lancaster, Dorsey & Whitney LLP, 50 South Sixth Street, Suite 1500, Minneapolis, Minnesota 55402, and J. Thomas Vitt, Jones Day, 90 South Seventh Street, Suite 4950, Minneapolis, Minnesota 55402, for Defendants and Counter-claimants.

SUSAN RICHARD NELSON, United States District Judge

## I.     INTRODUCTION

This matter is before the Court on the parties' requests for claim construction, as found in their Joint Status Report Regarding Claim Construction [Doc. No. 77] and supporting briefs (Plaintiff's Opening Claim Construction Brief [Doc. No. 78], Defendants' Opening Claim Construction Brief [Doc. No. 80], Plaintiff's Responsive Brief [Doc. No. 83], Defendants' Responsive Brief [Doc. No. 85], Defendants' Additional Claim Construction Brief [Doc. No. 152, Ex. 1], and Plaintiff's Response to Defendants' Additional Claim Construction Brief [Doc. No. 165]).

## II.     BACKGROUND

This patent infringement lawsuit concerns United States Patent No. 8,311,945 (the "'945 Patent"), titled "System and Method for Processing Check and Check Transactions." (Compl. [Doc. No. 1] ¶ 10.) Plaintiff Solutran, Inc. ("Solutran") alleges that it is the owner by assignment of all rights in the '945 Patent, and that Defendants U.S. Bancorp ("U.S. Bank") and its subsidiary, Elavon, Inc. ("Elavon"), have infringed the '945 Patent by "using, offering to sell, and selling the methods claimed in that patent." (*Id.* at ¶¶ 10, 16.) In particular, Solutran contends that Defendants' "Electronic Check Service" ("ECS") product copies Solutran's patented process, which it markets as "Solutran's POS Imaging Network" ("SPIN"). (*Id.* at 1, 9, 11.) This infringement has, according to Solutran, caused it harm and bears the potential for irreparable injury unless corrected by the Court. (*Id.* at 17.) Defendants deny that ECS infringes upon the '945 Patent, and in their own right bring claims seeking declaratory judgments of non-infringement and patent invalidity. (Am. Answer [Doc. No. 17] ¶ 11; Countercls. [Doc. No. 17] ¶¶ 9-12.)

The Abstract of the '945 Patent describes the invention as follows:

A method of processing paper checks that divides into two independent paths the processing of a data file representing a check and the digital image of the check. The data files and image files are separated both in time and in space, with the data files being used to promptly initiate the transfer of funds to and from appropriate accounts, while the paper checks, at a remote location and typically lagging in time, are scanned to create digital image files and deposited as an image or substitute check if deemed ACH ineligible. The method provides for the comparison of data files to image files, based on MICR information, to find any unmatching or mismatched items for exception processing and a process to manage ACH-ineligible items as an image or substitute check.

(Compl., Ex. A.). Figure 3 of the Specification provides a schematic representation of a preferred embodiment of Solutran's model:



(*Id.* at 4:30-34 & Fig. 3.) Figure 4 is a further depiction of the system and method of Figure 3, "with additional details shown regarding processing of exceptions."



**FIG. 4**

(*Id.* at 4:35-37 & Fig. 4.) Finally, Figure 6 shows "three categories of exceptions and the steps followed for each type of exception."



FIG. 6

(*Id.* at 9:27-28 & Fig. 6.)

In total, the '945 Patent makes six claims, three of which (claims 1, 4, and 5) are independent, and three of which (2, 3, and 6) are dependent. For purposes of this matter,

the parties dispute the meaning of eight separate terms[1] found variously in claims 1, 2, 4, and 5. (Joint Status Report Regarding Claim Construction ("Joint Status Report") at 1-5.) All disputed terms are found in at least claims 1, 2, and 5 which are reproduced here in whole or part for illustrative purposes:

1. A method for processing paper checks, comprising:

   a) electronically receiving a data file containing data captured at a merchant's <u>point of purchase</u>, said data including an amount of a transaction associated with <u>MICR information</u> for each paper check, and said data file not including images of said checks;

   b) after step a), <u>crediting an account for the merchant</u>;

   c) after step b), <u>receiving said paper checks</u> and scanning said checks with a digital image scanner thereby creating digital images of said checks and, for each said check, associating said digital image with said check's MICR information; and

   d) <u>comparing by a computer said digital images, with said data in the data file to find matches</u>.

2. A method according to claim 1, further comprising the step of:

   e) providing <u>exception processing procedures</u> <u>for any unmatched or mismatched digital images and data in the data file</u>.

5. A method for processing paper checks, comprising:

   a) electronically receiving data files from more than one merchant, each data file containing data captured at a merchant's point of purchase, said data including an amount of a transaction associated with MICR information for each paper check in a batch of paper checks, and said data file not including images of said checks;

---

[1] A ninth term was also originally disputed, but the parties have since agreed that its construction is no longer necessary. (*See* Defs.' Responsive Br. at 16.)

      b)  <u>storing data from said data files in association with a respective</u>
           <u>merchant identifier;</u>

    . . . .

(Compl., Ex. A at 10:54-11:5; 12:3-11 (emphasis added to denote disputed terms).)

## III.    DISCUSSION

### A.    Legal Standard

Patent claim construction, i.e., the interpretation of the patent claims that define the scope of the patent, is a matter of law exclusively for the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). Proper claim construction requires an examination of the intrinsic evidence of record, including the claim language, the specification, and the prosecution history. *Computer Docking Corp. v. Dell, Inc.*, 519 F.3d 1366, 1373 (Fed. Cir. 2008) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed Cir. 1996)). In all instances, however, the court must begin with the words of the claims themselves, which are "of primary importance, in the effort to ascertain precisely what it is that is patented." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (quoting *Merrill v. Yeomans*, 94 U.S. 568, 570 (1876)); *see also Clare v. Chrysler Group LLC*, 819 F.3d 1323, 1327 (Fed. Cir. 2016) ("The language of the claims determines what the patentee regards as the invention and defines what the patentee is entitled to exclude.") (citation omitted). The words of a claim generally carry "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313.

Several resources exist to aid the court in understanding how such a person would understand the scope of a claim term. "To begin with, the context in which a term is used in the asserted claim can be highly instructive." *Id.* at 1314. Likewise, other claims of the patent in question can be "valuable sources of enlightenment as to the meaning of a claim term." *Id.* (citing *Vitronics*, 90 F.3d at 1582). "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15.

Because the claims do not stand alone, however, but are part of "a fully integrated written instrument," *Markman*, 52 F.3d at 978, they must also be read in view of the specification—"the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582). Thus, the specification may reveal a special definition given to a claim term by the patentee, or disclose an intentional disclaimer of claim scope. *Id.* at 1317. The Federal Circuit has frequently admonished lower courts to avoid the temptation of importing a limitation from the specification into the claim itself. *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005) ("In examining the specification for proper context, however, this court will not at any time import limitations from the specification into the claims.") (citation omitted). In particular, a description of a preferred embodiment contained within the specification does not—by itself—indicate intent to confine the claims to that embodiment. *See, e.g.*, *Inline Plastics Corp. v. EasyPak, LLC*, 799 F.3d 1364, 1369 (Fed. Cir. 2015) (quoting *Phillips*, 415 F.3d at 1323).

Beyond the specification itself, the Court should also consider the patent's prosecution history. *Markman*, 52 F.3d at 980. Like the specification, the prosecution provides valuable evidence of how the Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. Although the Court may, in its discretion, consider extrinsic evidence as an aid in determining proper claim construction, it is improper to do so if intrinsic evidence alone will otherwise resolve any ambiguity in the disputed term. *See Vitronics*, 90 F.3d at 1583. The Court may, however, use a dictionary or technical treatise to "assist in understanding the commonly understood meaning" of a term, so long as any meaning found in such sources does not contradict the definition that is found in the patent documents. *Phillips*, 415 F.3d at 1322-23.

Finally, a court need not construe every term for no other reason than because one or another party requests that it do so. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008); *see also Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (noting that claim construction "is not an obligatory exercise in redundancy"). A term that is clear and readily comprehensible in its original form may need no further elucidation. *See Ecolab USA v. Diversey, Inc.*, No. 12-cv-1984 (SRN/JJG), 2015 WL 258570, at *14 (D. Minn. Jan. 23, 2014) (declining to construe term that was "already understandable"); *see also Phillips*, 415 F.3dd at 1314 (observing that the proper construction of a term may at times be apparent even to laypersons); *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) (holding that claims at issue did "not require elaborate interpretation"). However, "[w]hen the parties present a fundamental

dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro*, 521 F.3d at 1362.

## B.     The Disputed Terms

### 1.     "Point of purchase"

The parties' first dispute concerns the meaning of the term "point of purchase," which appears in claims 1, 4, and 5 of the '945 patent.  Solutran contends that the most appropriate construction of this term is "point of sale terminal."  (*See* Joint Status Report at 2.)  In its view, this construction is necessary because it clarifies that the specific location at which the relevant data is captured is the terminal equipment at which the customer presents the paper check to the merchant.  (Pl.'s Opening Br. at 10.)  It argues that the phrase is otherwise ambiguous as to whether the "merchant's point of purchase" is limited to the discrete location at which the data is received, or can be read to encompass the entire building housing the point of purchase.  (*Id.*)

In contrast, while Defendants do not dispute that the "point of purchase" is properly restricted to the discrete place where the cashier accepts a check from a consumer, it counsels the Court to reject the addition of the word "terminal" to the construction.  (Defs.' Opening Br. at 7.)  By Defendants' reading, to add "terminal" is to add ambiguity to the definition, because it suggests that the "point of purchase" refers to a single piece of equipment, when the specification makes clear that two or more pieces of equipment may be used.  (*Id.* at 8.)  Thus, Defendants advocate for a simpler construction—that "point of purchase" should be recast as "point of sale."  (*See* Joint Status Report at 2.)

It is clear to the Court—and the parties have frankly admitted as much—that their dispute here is more apparent than real. (*See* Hr'g Tr. [Doc. No. 97] at 8:24, 42:14.) Both parties agree that the proper construction of the term "point of purchase" should be limited to the discrete point at which the cashier or merchant accepts a check from the consumer, and not, for instance the store as a whole. (*See, e.g.*, Defs' Reply Br. at 1. ) To the extent they disagree, that disagreement is simply one of expression—whether inclusion of the word "terminal" to the parties' otherwise identical constructions improperly limits the "point of purchase" to a single piece of equipment. Of note, neither party disputes that more than one piece of equipment can be involved. (*See, e.g.*, Pl.'s Reply Br. at 2.)

In the Court's view, this dispute is easily resolved without the need for great elaboration. At the outset, the Court must reject the Defendants' proposal—"point of sale"—because it does not in any way clarify the original term—"point of purchase." *See Tech. Innovations, LLC v. Nstein Techs., Inc.*, No. 2:10-cv-341 (FTM), 2015 WL 1910434, at *10 (M.D. Fla. Apr. 27, 2015) (noting that "simply replacing one word of the term at issue with a synonym does not provide any type of construction"). It is readily apparent that simply changing the word "purchase" to "sale" does not address Solutran's concern that the claim construction clearly indicate that the "point of purchase" is more narrowly restricted than, for instance, the building where the sale occurred. In contrast, the Court agrees with Solutran that including the word "terminal" sufficiently makes clear the restricted location at which the purchase occurs, and properly applies the terminology used in the specification, which makes reference to a "point-of-

sale terminal" in connection with data captured from the check presented to the merchant. (*See* Compl., Ex. A at 6:26-31.)  Accordingly, the Court will construe the claim term "point of purchase" as "point of sale terminal."

In so deciding, the Court is not unmindful of Defendants' concerns that the word "terminal" may improperly suggest that the point of sale involves only a single piece of equipment.  Defendants are correct that the specification—by describing the use of both a "MICR reader" and a "POS device" at the point of purchase—belies such a limitation. (*See* Compl., Ex. A at 5:12-20.)  Nonetheless, the Court agrees with Solutran that when read in the context of the language of the claim itself, it is sufficiently clear that the "capture" of "data" is *at* the point of sale terminal—not *by* it.  (*See id.* at 10:56.)  By requiring capture at the point of sale terminal, the claim language as construed leaves the number of pieces of equipment involved in the capture unspecified, which is how it should be.

### 2.    "Receiving said paper checks"

The parties next dispute the meaning of the term "receiving said paper checks," which may be found in claims 1, 4, and 5 of the '945 patent.  (Joint Status Report at 2.) Solutran proposes that the term should be construed as "the paper checks are received from a location different from where the checks are scanned."  (*Id.*)  In other words, Solutran suggests that a necessary element of "receiving said paper checks" is that it occur at a different point—both temporally and physically—from where the customer initially proffered the check.  (*See* Pl.'s Opening Br. at 13; Pl.'s Reply Br. at 3.)  In

contrast, Defendants argue that the term is not inherently ambiguous and thus that no construction is required.  (Joint Status Report at 2.)

In support of its preferred construction, Solutran stresses the ordering of steps in the claims, which it contends plainly require that there be some movement of the check between the point at which it is first received (the point of purchase) and the point at which it is scanned with a digital image scanner.  As Solutran observes, each independent claim of the '945 patent requires that the combined action of "receiving said paper checks and scanning said checks with a digital image scanner" occur *after* the step of receiving a data file that contained data from the initial transaction.  (*See* Pl.'s Opening Br. at 13.) By its reading of the relevant language, it would be nonsensical to conclude that the act of "receiving" a check *must* occur temporally at a later time than when it was first presented to the merchant, but need *not* also occur at a different location.  (*Id.* at 14.)

Solutran further contends that its preferred construction is compelled by the '945 patent specification, which repeatedly emphasizes the separate paths that the data file and the paper checks take from the point of purchase.  For example, Solutran notes that the specification calls for the paper checks to be "physically transported from the merchant's place of business to another location for scanning and image capture." (Compl., Ex. A. at 3:20-23.)  Likewise, the abstract highlights the temporal and physical separation of the data files and paper checks, with the paper checks being scanned "at a remote location" with, "typically" a time lag.  (Compl. Ex, A, Abstract.)  Taken on the whole, Solutran argues that a reading of the claim language that would have the checks being scanned at

the point of purchase would not mesh with the requirement that the checks be received *after* the data file, as the claims specify. (Pl.'s Opening Br. at 15.)

In response, Defendants submit that the ordinary meaning of "receiving said paper checks" is apparent from the plain text of the claims, and does not require the checks to travel from one location to another. (Defs.' Opening Br. at 9.) They argue that Solutran could have included a limitation requiring movement between disparate locations if it had wanted to do so, and, indeed, did so in its original claims filed with the Patent Office. (*See* Kappelman Aff. [Doc. No. 82], Ex. A at 283 (proposing an original claim 1(c), requiring "physically transporting said batch of checks to a location remote from said merchant").) Having removed that limitation during patent prosecution, Defendants contend that Solutran cannot now be allowed to re-import it during claim construction. (Defs.' Opening Br. at 9.) Furthermore, Defendants argue that nothing in the claims suggests that check scanning must occur at "a different entity or a different address." (*Id.* at 10.)

Having reviewed the parties' contentions and the relevant intrinsic evidence, the Court agrees with Solutran that the term "receiving said paper checks" should be construed as "the paper checks are received from a location different from where the checks are scanned." The Court is persuaded that a proper reading of the claim language mandates this result, particularly by specifying a temporal order in which "receiving" said paper checks clearly occurs at a later time than the point at which the check is first given to the merchant. (*See, e.g.*, Compl., Ex. A at 10:54-65.) Any other conclusion would presume that the merchant could both receive a check from the customer at the

point of sale (for purposes of capturing data), and then, without any intervening movement, somehow "receive" it again in order to scan it. Such a reading would be an improbable stretch—both of logic and language.

Thus, in the Court's view, a simple parsing of the language of the claims, without reliance on any other evidence, would suffice to render Solutran's proposed construction the proper one. Importantly, however, a reading requiring some intervening movement between receipt of the check by the merchant at the point of purchase and the point at which it is scanned is amply supported by the patent specification. (*See, e.g.*, *id.* at 3:20-23, 5:47-55.) While Defendants are correct to argue that a single embodiment described in the specification is insufficient, *on its own*, to limit otherwise broad claim language, *see Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1345 (Fed. Cir. 2008), the important thing here is that the specification does not stand alone. It merely supports an already highly probable reading of the claim language. In such a situation, the specification is "highly relevant", *Phillips*, 415 F.3d at 1315, and serves further to remove doubt as to the proper interpretation.

Furthermore, Solutran's proposed reading is not as broad as Defendants imply. In their briefing on the matter, Defendants suggest that Solutran must mean that the "location different from where the checks are scanned" necessarily refers to "a different entity or a different address." (*Id.* at 10.) But that contention is a straw man—Solutran never proposes as much, and, indeed, specifically rejected the assertion in its reply brief. (*See* Pl.'s Reply Br. at 3.) In any event, the Court recognizes that the proper construction

means what it says—the location must simply be different from where the checks were before being received.

### 3. "Comparing by a computer said digital images, with said data in the data file to find matches"

The parties' third claim construction dispute concerns the meaning of the phrases "comparing by a computer said digital images, with said data in the data file to find matches," which is found in claim 1, and "to find matches," which is found in claims 1, 4, and 5. (*See* Joint Status Report at 2.) As to the longer phrase, Solutran takes the position that everything up to "to find matches" is unambiguous and need not be construed. (*See* Pl.'s Opening Br. at 16.) With regard to "to find matches," it submits that the Court should construe the phrase as follows: "the purpose is to match up the digital images created in step c) with data in the data file from step a) that relates to the same paper check." (*Id.*) Defendants, in contrast propose a construction covering both phrases, which reads:

> Using a computer to find matches between digital images and data files by comparing at least the amount of the transaction, where matches means finding the amount of the transaction from the data in the data file that is identical to the amount of the transaction in the separately generated image file to determine whether the data from the data file and image file were obtained from the same paper check.

(Joint Status Report at 2-3.)

A careful examination of the briefs, however, makes clear that two particular disputes predominate. The first is whether the use of the term "said data" (found in claims 1(d), 4(e), and 5(e)) should be construed to incorporate the definition of that

phrase found in claims 1(a), 4(a), and 5(a). The second involves the proper interpretation of the term "match." The Court will address each issue separately here.

Defendants argue that the term "said data" is assigned a fixed definition by the claims, and that, as a matter of law, it must be construed identically throughout. In support of this argument, they direct the Court's attention to claim 1(a) as illustrative. That claim provides, in part, for "electronically receiving a data file containing data captured at a merchant's point of purchase, *said data* including an amount of a transaction associated with MICR information . . . ." (*See* Compl., Ex. A at 10:55-58 (emphasis added).) By Defendants' reading of applicable case law, the use of the word "said" before "data" throughout the claims indicates that the term is meant to retain the meaning originally assigned to it. (*See* Defs.' Opening Br. at 11.) Because the original reference to "said data" indicates that it includes the amount of the transaction, Defendants contend that the comparing step *must* at least involve a comparison of the amount of the transaction. (*See id.* at 12.)

On this point, the Court agrees with Defendants. It is axiomatic that a patent's claims "provide substantial guidance as to the meaning of particular claim terms," *Phillips*, 415 F.3d at 1314, and claim terms are "normally used consistently throughout the patent . . . ." *Id.* Here, the first reference to the term "said data" makes clear that a necessary component of that data set is the amount of the transaction. *See Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1214 (Fed. Cir. 2008) ("This court has consistently interpreted 'including' [to mean] that the listed elements . . . are *essential* but other elements may be added.") (emphasis added). Furthermore, while it is not strictly correct,

as Defendants contend, that the use of "said" prior to a term indicates that all following references to "said [term]" *must* be construed identically to the antecedent usage, *see Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375-76 (Fed. Cir. 2008), they *should* be so construed unless that reading is contradicted by the context. *See id.* Here, nothing about the context in which "said data" occurs in claims 1(d), 4(e), and 5(e) suggests that it should be read differently than in its antecedent usage. Accordingly, the Court concludes that the comparison step should be construed so as to require "comparing at least the amount of the transaction." In this sense, the Court rejects Solutran's suggestion that the phrase may be left unconstrued. In so holding, however, the Court should not be understood as saying that the comparison must rely *only* on the transaction amount—merely that it must be at least one of the elements considered. *Cf. Lucent Techs.*, 525 F.3d at 1214.

The next issue concerns the proper construction of "to find matches." Defendants contend that the "matches" being referenced must be the amount of the transaction. (*See* Defs.' Opening Br. at 13.) In other words, Defendants apparently construe the claim term to mean that a match exists if—and only if—the amount of the transaction found in the data file matches with the amount of the transaction in the scanned image of the check.

Solutran responds that Defendants' construction is overly narrow and attempts to import limitations into the word "matches" that are belied by the claim language and the patent specification. Solutran argues that while it is true that the data in the data file includes the amount of the transaction, nothing in the claim language mandates that this amount be used as the basis of a match. (Pl.'s Opening Br. at 19.) It notes that if

Defendants' position was adopted, "every $10.00 check that the processor received would be matched with every other $10.00 check." (*Id.*) Such a result would, in Solutran's view, be "useless," and is clearly not mandated by the language of the claims, which never discuss using the transaction amount to perform the matching operation. (*Id.*) Instead, Solutran suggests that the matching step merely requires finding matches based on some aspect of the data in the data set, such as MICR information. Accordingly, it proposes that the proper construction of "to find matches" is simply to "match up the digital images created in step c) with data in the data file from step a) that relates to the same paper check. (*Id.* at 16.)

As to this issue, the Court finds Solutran's argument the more persuasive. Defendants' construction overly narrows the meaning of "to find matches" in a way that is not supported by the claim language itself. More importantly, it is contrary to the patent specification. The Abstract, for instance, explains that the comparison of the data files is "based on MICR information," while the specification itself makes clear that matching occurs, based on other information, even when the transaction amounts do *not* match. For instance, the "data mismatch" exception processing procedure is described as follows:

> A third category of exceptions is "data mismatch" (700) where a match is found *based on the MICR information*, but some portion of the data from the image record does not match with the data record.

(Compl., Ex. A at 10:16-19 (emphasis added).)

As Solutran notes, Defendants' construction, which considers matches only on the basis of transaction amount and ignores other possible bases, would "completely

19

exclude" this scenario. As the Court has discussed, the specification "is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d 1315 (citation omitted). Here, that specification suggests that Defendants' construction of "to find matches" is not accurate—after all, "a claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013). In contrast, Solutran's proposed definition properly explains that the purpose of the matching step is to connect the scanned check image with some data in the data file relating to the same paper check.

Accordingly, the Court construes the claim term as follows: "said data" must include, but is not necessarily limited to, the amount of the transaction; "to find matches" means "the purpose is to match up the digital images created in step c) with data in the data file from step a) that relates to the same paper check." In all other respects, the Court agrees with Solutran that the claim term is unambiguous and that further construction is unnecessary.

### 4. "Exception processing procedures"

The parties next dispute the meaning of the phrase "exception processing procedures," which occurs in claim 2 of the '945 patent only. (*See* Joint Status Report at 3.) Solutran submits that the proper construction should be as follows: "processing procedures that identify and resolves situations where (i) the data file contains data for which no digital image was received ('expected, not received'), (ii) there is a digital image for which no matching data in the data file were received ('received, not expected'), or (iii) some portion of the data in the data file does not match the digital

20

image ('data mismatch')." (*Id.*) In contrast, Defendants propose that the term is readily understandable by a jury in its present form, and thus may be given its ordinary meaning without further construction. (*See* Defs.' Opening Br. at 14.) However, if the Court concludes that a construction is needed, they propose "procedures for processing transactions that are not standard." (*Id.*)

In advocating for its chosen construction, Solutran begins by noting that the text of claim 2 requires that the "exception processing procedures" be provided "for any unmatched or mismatched digital images and data in the data file." While these two phrases are to be construed separately in this Order, Solutran contends that the two must nevertheless be read in conjunction, with each informing the proper construction of the other. (*See* Pl.'s Opening Br. at 21.) Thus, Solutran asserts that claim 2's exception processing procedures must be of a type that is appropriate for any unmatched or mismatched digital images and data. In its view, the specification clearly delineates the only three such exceptions that may occur, which it refers to as (1) "expected, not received;"[2] (2) "received, not expected;"[3] and (3) "data mismatch."[4] (*Id.* at 22-23.) The first two of these three exceptions Solutran asserts cover the "unmatched" situation, while the third applies for mismatches. (*Id.* at 21.) In Solutran's view, limiting the claim term

---

[2] "Expected, not received" exception processing covers situations where the data file contains data for which the matching digital image was not received. (*See* Compl., Ex. A at 9:28-38.)

[3] "Received, not expected" exception processing applies where "there is an image record for a transaction, but no matching data record." (*See* Compl., Ex. A at 10:1-3.)

[4] "Data mismatch" exception processing covers situations where a match is found based on the MICR information, but some other portion of the data from the digital image does not match the data in the data file. (*See* Compl., Ex. A at 10:17-20.)

to only these three situations properly applies the scope contemplated by the '945 patent, without impermissibly extending its reach. (*See id.* at 23.)

In contrast, Defendants argue primarily that no construction of the term "exception processing procedures" is necessary because the phrase is readily accessible and further description will not add clarity. (Defs.' Opening Br. at 14.) In support of this assertion, Defendants point to the deposition testimony of Solutran's expert, William Saffici, who testified simply that "[e]xception processing has as many definitions as we could find people on this floor in this building. If you look at the word exception, it means something that is not normal, something out of the norm." (Kappelman Aff., Ex. C at 64:24-65:3.) Defendants also highlight their own expert's opinion that the phrase "exception processing procedures" is an ordinary phrase in the banking industry, that its use in the '945 patent does not differ from its ordinary meaning, and that it thus does not need construction. (*See* McEntee Decl. [Doc. No. 81] ¶ 39.)

Beyond their belief that the term is unambiguous and needs no construction, however, Defendants also take issue with what they see as Solutran's attempt to improperly import a limitation from the specification into the claim language. (*See* Defs.' Opening Br. at 15.) In support, Defendants note that the '945 patent does not define "exception processing procedures," nor does it disclaim all forms of exceptions other than those highlighted by Solutran. (*Id.*) To allow a preferred embodiment to limit the claim scope, Defendants argue, would be contrary to Federal Circuit guidance. *See, e.g.*, *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327-28 (rejecting importation of embodiment from specification as limitation on claim term).

Finally, Defendants argue that even if Solutran's construction were otherwise proper, it would be incomplete because a person of ordinary skill in the art would recognize that at least one common type of exception is left uncovered—when duplicate data files and duplicate image files are present. (*See* Defs.' Opening Br. at 15 (citing McEntee Decl. ¶ 42).) Because this "common exception" is not contemplated by Solutran's proposed definition, that definition is necessarily incorrect. (*See id.* at 15-16.)

Having considered the parties' positions, the Court begins its analysis by noting is agreement with Solutran on one key point—the term "exception processing procedures" must be read in context with its following phrase, "for any unmatched or mismatched digital images and data in the data file." *See ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) (declaring that "the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms"). The conclusion the Court draws from this admonition, however, is a different one. As several district courts have recognized, a definition of a claim term that renders subsequent claim language superfluous or redundant is "rarely correct." *Luv N' Care, Ltd. v. Jackel Int'l Ltd.*, 115 F. Supp. 3d 808, 823 (E.D. Tex. 2015); *see also Symantec Corp. v. Acronis, Inc.*, No. C-11-5310 (EMC), 2013 WL 752472, at *2 (N.D. Cal. Feb. 27, 2013) (declining to adopt proposed construction because it was "redundant given the surrounding words of the claim"); *Atser Research Techs., Inc. v. Raba-Kistner Consultants, Inc.*, No. SA-07-CA-93-H, 2009 WL 691118, at *11 (W.D. Tex. Mar. 2, 2009) (rejecting construction that included "the surrounding words of the claim" as "redundant and unnecessary").

Here, Solutran contends that its construction of the term "exception processing procedures" merely recognizes and applies the following requirement of the claim that those procedures be "for any unmatched or mismatched digital images and data." But by effectively defining "exception processing procedures" in terms of the surrounding claim language, Solutran renders that language redundant. Put slightly differently, if Solutran is correct that the only three "unmatched or mismatched" situations contemplated by the '945 patent are the three it has identified in its proposed definition, then there is no need to explicitly define "exception processing procedures" in terms of those three situations—the claim is already expressly so limited.

More to the point, however, the Court agrees with Defendants that the three scenarios posited by Solutran as covering all unmatched or mismatched situations— "expected, not received," "received, not expected," and "data mismatch"—do not necessarily cover all possible scenarios, and represent an attempt to import a limitation from a preferred embodiment. Nowhere does the specification clearly define "exception processing procedures," and the language used in the specification to describe Solutran's three scenarios suggests that they were not envisioned as exclusive. For instance, the specification refers to "received, not expected" as "[*a*] second category of exceptions," rather than "*the* second category." (*See* Compl., Ex. A at 10:1 (emphasis added); *see also id.* at 10:16 (describing "data mismatch" as "[*a*] third category of exceptions") (emphasis added).) Likewise, the specification suggests that a "step in processing exceptions may include reporting of exceptions by the [third party payment processor] to the merchants." (*See id.* at 10:26-28.) Such a step would seem to be additional to, and

not covered by, Solutran's proposed construction, which defines "exception processing procedures" to mean "processing procedures that identify and resolve," rather than "identify, resolve, *and report*."  Accordingly, the Court finds that Solutran's proposed definition is overly narrow and attempts to improperly import a limitation from a preferred embodiment.  *See Acumend LLC v. Stryker Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007) (rejecting attempt to import a feature from a preferred embodiment into the claims).

In contrast, the record evidence suggests that the meaning of the term "exception processing procedures" is not inherently ambiguous, particularly in light of the claim language following it, which makes clear that the "exception processing procedures" are those necessary "for any unmatched or mismatched digital images and data in the data file."  Read in this context, the ordinary and customary meaning of the term is readily accessible to a person of ordinary skill in the art.  Accordingly, the Court concludes that no special construction of this term is necessary.

## 5.    "For any unmatched or mismatched digital images and data in the data file"

The parties' next dispute—closely related to that for "exception processing procedures"—involves the meaning of the term "for any unmatched or mismatched digital images and data in the data file," which is found only in claim 2 of the '945 patent. (*See* Joint Status Report at 3.)  Solutran submits that the phrase is ambiguous, and should be construed to mean "for situations where data in the data file received from the merchant's point of purchase could not be matched with, or are not consistent with, the

information in the digital images created by scanning the paper checks." (*See id.* at 3-4.) By comparison, Defendants advocate for a construction that reads "for any unmatched or mismatched digital images and data, including at least the amount of the transaction, in the data file." (*See id.* at 3.)

Solutran argues that its construction is necessary to explicitly define what items are unmatched or mismatched, and to clarify that the exception processing procedures occur when these items cannot be matched up, or are not consistent with each other. (*See* Pl.'s Opening Br. at 24.) In contrast, it argues that Defendants' construction adds nothing to the claim language except to attempt to define the "data" referred to by the term as including "at least the amount of the transaction." (*Id.* at 25.) Adopting this definition would, in Solutran's view, mandate that claim 2's exception processing procedures would occur *only* if the transaction amount is one of the data items that are unmatched or mismatched. Such a limitation, it argues, is not found in the claim language. (*See id.*) More importantly, it runs "contrary to the specification's description of the invention," which describes three types of exception processing—two of which ("expected, not received," and "received, not expected") do not use the transaction amount in conducting a comparison. (*See id.* at 25-27.) Adopting Defendants' restrictive reading, Solutran warns, would eviscerate the purpose of the claim. (*See id.* at 27.)

In response, Defendants note that the claim term is largely unambiguous. (*See* Defs.' Opening Br. at 17.) They argue that their definition merely recognizes that claim 1(a) has defined "data" as "including an amount of a transaction," and that the identical language in dependent claim 2 must be given similar effect. (*Id.*) Furthermore,

Defendants reject Solutran's assertion that such a construction would render two of three forms of exception processing described in the specification inapplicable. (*Id.* at 18.) In their view, defining "data in the data file" to include at least the amount of the transaction would have no effect on whether that data is unmatched to a digital image. Since "data in the data file" can still be "unmatched," both categories of exception processing can still occur under their construction. (*See id.*)

Having reviewed the parties' positions, the Court concludes that the proposed constructions are not sufficiently helpful or correct to warrant adoption. Read on its own, the claim term at issue here is not ambiguous or inherently difficult to understand. The question thus becomes whether either parties' construction materially advances the understanding of the term, or correctly applies an unusual definition to an otherwise commonly understood word. *See Phillips*, 415 F.3d at 1314. In this instance, the answer appears to be no. Solutran's definition, for instance, is essentially little more than a recasting of the claim language in longer form. While elaboration can, of course, provide greater insight into the meaning of a short phrase, in this instance the Court finds that the proposed construction is no more precise nor clear than the plain language of the claim. Accordingly, the Court declines to adopt Solutran's construction.

Likewise, Defendants' construction is essentially the language of the claim with the words "including at least the amount of the transaction" added in the middle. Thus, the only way in which Defendants' definition would be of help to the jury would be if its addition is a correct interpretation of the claim language. But here, the Court concludes that it is not. Defendants essentially argue, as they did in the context of interpreting

"comparing by a computer said digital images, with said data in the data file to find matches," that the claim term's reference to "data in the data file" must be read to incorporate the definition of "said data" found in claim 1(a). But in the Court's view, the very fact that claim 1(a) uses the term "*said* data in the data file," and that this identical term is later used in claim 1(d) (as well as claim 6, also a dependent claim) suggests that its omission in claim 2 has meaning. *See Phillips*, 415 F.3d at 1314 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms."). Here, the Court concludes that the purpose of the omission is to indicate that the data utilized in the comparison step need *not* necessarily utilize the transaction amount.

This conclusion is bolstered by an analysis of the specification. As Solutran points out, adopting Defendants' reading would greatly restrict or eviscerate the usefulness of two of the three types of exception processing described in the patent specification, because neither relies specifically on the amount of the transaction to conduct exception processing. As the Court has noted, a claim construction "that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct. *Accent Packaging*, 707 F.3d at 1326. Because Defendants' construction thus attempts to add a limitation to the language of claim 2 that is not mandated by the intrinsic evidence, the Court concludes that Defendants' proposed construction is not helpful.

Because neither parties' construction is helpful to illuminating what is a readily accessible and unambiguous claim term, the Court finds that no construction of the term is required. Accordingly, the ordinary and customary meaning applies.

### 6. **"Crediting an account for the merchant"**

The next claim dispute involves the meaning of the term "crediting an account for the merchant," which appears only in claim 1 of the '945 patent. (*See* Joint Status Report at 4.) Solutran argues that the phrase does not consist of any technical terms of art, that no special meaning is provided for in the specification, and thus that the phrase can be given its ordinary and customary meaning. (*See* Pl.'s Opening Br. at 28.) In contrast, Defendants propose that the term be construed to mean "posting the amount of the transaction to a merchant's account and having the funds available to the merchant after processing a data file through the ACH network." (*See* Defs.' Opening Br. at 19.)

The parties' dispute as to the proper interpretation of this claim term has essentially three components. The first component involves the proper construction, if any, of the term "crediting." Solutran argues that Defendants' proposed construction unnecessarily substitutes the word "posting" for "crediting," and in doing so adds rather than removes ambiguity. (*See* Pl.'s Reply Br. at 10.) In particular, Solutran notes that the words "credit" and "crediting" are commonly used and well understood even by lay jurors, and have a meaning akin to "adding," whereas "posting" merely suggests "entering" an amount. (*See id.*) The latter, Solutran notes, can include debits, which are indisputably not covered by the act of "crediting."

The Court agrees. The term "crediting" is commonly understood and is not in need of further construction in order to be rendered accessible to the jury. At best, Defendants' proposed replacement—posting—is merely a synonym. At worst, it is less

precise and inaccurate. Accordingly, the Court declines to construe "crediting" as Defendants suggest.

The second dispute involves whether, as Defendants suggest, "crediting an account for the merchant" necessarily implies that funds will be available to the merchant at that time. In support of this construction, Defendants note that the purpose of the '945 patent is to get the merchant his money "fast." (Hr'g Tr. at 44:5.) Accordingly, they argue that the term "crediting" must mean that the merchant has actual access to the money at that time. (*See id.* at 71:13-72:9.) In contrast, Solutran argues that the term "crediting" means nothing more than that a credit has been added to the merchant's account—not necessarily that funds are immediately available at that time. (*See* Pl.'s Reply Br. at 11-12.) In particular, they note that neither the specification nor the claim language itself provides any indication as to whether "crediting," in the context in which it is used in claim 1, requires immediate access to funds. (*See id.*)

On this point, the Court agrees with Solutran. The record evidence is silent as to whether the act of "crediting" an account necessarily means that the merchant has immediate access to his money. Accordingly, in the absence of any contrary indicia suggesting the limitation Defendants seek to impose on the claim term, the Court concludes that term must be left to its plain and ordinary meaning.

The final dispute between the parties, as to this term, is whether "crediting" must occur by processing a data file through the ACH network. (*See* Defs.' Opening Br. at 19.) Defendants contend that the specification and the patent prosecution history indicate that the only means of crediting a merchant's account before scanning taught by claim 1

of the '945 patent involves use of the ACH network. (*See id.* at 20-23.) In response, Solutran effectively proffers claim 4 as proof that no such restriction was intended to be read into claim 1. It notes that while claim 4 makes explicit reference to processing transactions through the ACH network, claim 1 is silent on the matter. In Solutran's view, this sharp discrepancy between the language of the claims suggests that, while claim 4 *was* intended to be read to incorporate the ACH network, no such inference can or should be drawn as to claim 1.

Once again, the Court agrees with Solutran. As the Federal Circuit has carefully explained, "[d]ifferences among claims can . . . be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Although in the context of a comparison between two independent claims, "[c]laim differentiation is a guide, not a rigid rule," *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006) (citation and quotation omitted), a presumption exists that each claim in a patent has a different scope. *See id.* (citation omitted). In this instance, the Court is persuaded that the repeated and specific discussion of the use of the ACH network in claim 4, when juxtaposed against the comparative silence in claim 1, suggests that claim 1 was not meant to be construed as *requiring* processing through the ACH network. *Cf. Voda v. Cordis Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008) (finding that difference in language between independent claims "strongly implies" that express limitation in one should not be implied to the other).

Because the Court thus concludes that none of the limitations Defendant seeks to read into the "crediting an account for the merchant" term are proper, the Court declines

to adopt Defendants' proposed construction.  Instead, the Court agrees with Solutran that the term is not inherently ambiguous and is readily understandable when left to its plain and ordinary meaning.  Accordingly, no construction of this particular term is required.

7.     **"Storing data from said data files in association with a respective merchant identifier"**

The next dispute concerns the definition of "storing data from said data files in association with a respective merchant identifier," found only in claim 5.  (*See* Joint Status Report at 4.)  Solutran contends that the term requires no additional construction and should simply be given its ordinary meaning.  (*See id.*)  In contrast, Defendants once again argue that the term "data" must be construed to include at least the amount of the transaction.  (*See* Defs.' Reply Br. at 17.)  They thus propose that the term be construed as "data, including at least the amount of the transaction, from the data file, and not the data file itself, must be stored and connected to a merchant identifier."  (*See id.*)

The Court agrees with Solutran that the term is not inherently ambiguous and thus may be given its plain and ordinary meaning.  Defendants' attempt to require that the stored data always include "at least the amount of the transaction" finds no support in the claim language itself nor in the specification.  Simply put, the claim language mandates storing "data" from "said data files."  It does not say storing "said data," or "all data," and the Court will not rewrite the claim to so require.  Likewise, the Court rejects Defendants' attempt to specify that the "data file" cannot be stored and connected to a merchant identifier.  While it is correct that claim 5(b) only speaks in terms of "storing data from said data files," that language does not require that the data be the *only* item

stored.  Once again, without some indication in the language of the claims or in the specification that such a requirement was intended—which Defendants have not supplied—the Court cannot artificially narrow the claim language.

Accordingly, because the Court finds that the term is unambiguous and readily understandable by the jury in its present form, it concludes that no construction is required.

## 8. "MICR information"

The parties' final dispute concerns the term "MICR information," which appears in claims 1, 4, and 5.  (*See* Joint Status Report at 4.)  Solutran proposes that the Court construe this term to mean "information taken from the MICR line of the paper checks." (*See id.*)  In contrast, Defendants argue that the proper construction should be as follows: "MICR stands for Magnetic Ink Character Recognition.  It is a line at the bottom of the check.  This MICR line on the check allows a reader to capture a consumer's account number, routing number of the financial institution holding the account, and the check number."  (*See id.*)

Defendants take the position that the term "MICR information" is synonymous with "MICR line."  (*See* Defs.' Opening Br. at 25.)  In support of this position, they rely on the following passage from the '945 patent specification:

> At the merchant's point of purchase 34, the cashier keys in the amount of the purchase, or applies amount captured at POS, and passes the check through a *MICR reader* that reads the MICR line of the check and *converts the MICR information to digital form*.  The MICR reader communicates directly or indirectly with the POS device that captures the amount, creating a digital record for each check transaction.

(Compl., Ex. A at 5:12-20.) (emphasis added). In their view, the emphasized words serve to show that "MICR line" and "MICR information" are used interchangeably. If it were otherwise, and MICR information was already "information taken from the MICR line of the paper checks," Defendants contend there would be no need to convert that information into digital form in the first place. (Defs.' Reply Br. at 19.)

Solutran responds by noting first that they do not disagree with the accuracy—in the abstract—of Defendants' proposed construction. For instance, Solutran concedes that "MICR" stands for Magnetic Ink Character Recognition, that the "MICR line" is found at the bottom of the check, and that a "MICR scanner" can scan the MICR line to capture an account number a routing number, and a check number. (Pl.'s Opening Br. at 31.) The problem Solutran identifies with Defendants' definition, however, is that it construes the wrong term. (*Id.*) Solutran notes that the claim term is not "MICR line" but "MICR information," and that, where the former is a physical line of text written at the bottom of the check, the latter is the information taken *from* that line. (*Id.* at 31-32.) In Solutran's view, the two clearly cannot be synonymous. To support this conclusion, as well as its preferred reading, Solutran observes that the same passage from the specification cited by Defendants demonstrates that the MICR information is acquired by passing the check through a MICR reader that reads the MICR line from the check. (*Id.* at 32.) It follows, Solutran contends, that the one must be different from the other.

Having reviewed the parties' contentions, the Court agrees with Solutran that Defendants' definition is not the correct one, because it is really a definition of the term "MICR line," and not "MICR information." Despite Defendants' contrary

characterization, it is plain to the Court that the two are not synonymous—the MICR line is the physical text placed at the bottom of the check, while the MICR information is the intangible information represented by that text. It is also apparent to the Court that the '945 patent specification applies this distinction by, for instance, using both terms in the same sentence. (*See* Compl., Ex. A at 5:14-16 (declaring that the cashier "passes the check through the MICR reader that reads the MICR line of the check and converts the MICR information to digital form").) It is a general presumption that when different terms are used, different meanings are intended, *cf. Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1087 (Fed. Cir. 2009), and in the Court's view, that presumption is rendered more conclusive when the terms are used in close proximity to each other. Thus, the definition of MICR information must be something different than it would be if the Court was tasked with interpreting "MICR line."

That being said, the Court concludes that Solutran's desired construction does not quite hit the mark either. As noted, Solutran proposes that "MICR information" should mean "information taken from the MICR line of the paper checks." While this definition is not truly circular, the Court cannot help but observe that it is close. More to the point, it provides no added clarity as to *what* information is taken from the MICR line, which is the nub of the matter—the Court doubts that the jury would be particularly confused about the definition of "MICR" or "MICR line."

Fortunately, as Defendants have recognized, the specification provides an answer to this question. It defines "MICR information" as "routing number, account number, and check number." (*See* Compl., Ex. A at 5:28.) As the "specification necessarily

35

informs the proper construction of the claims," *Phillips*, 415 F.3d at 1316, the Court concludes that these three components are necessary to any accurate construction of the term. When combined with Solutran's proposed construction, which properly emphasizes that "MICR information" is distinct from "MICR line" and is gleaned from that line, a correct construction emerges. Accordingly, the Court construes "MICR information" as "the consumer's account number, the routing number of the financial institution holding the account, and the number of the check, taken from the MICR line at the bottom of the check."

## IV.     ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that the claims at issue are construed as set forth in this Order.


Dated: May 24, 2017                              s/Susan Richard Nelson
                                                 SUSAN RICHARD NELSON
                                                 United States District Judge